No. 31,114.

A. J. WRIGHT, MARY WRIGHT, CLINTON WRIGHT, CLIFFORD E. JARRETT, RUSSELL S. JARRETT and LESTER M. JARRETT, *Appellees*, v. THE WRIGHT MINING AND ROYALTY COMPANY, BOSKA MINING COMPANY, CORTEZ-KING BRAND MINES COMPANY, CHARLES A. NEAL, D. R. SMITH, H. H. HUTLEY, J. H. BUTLER and ELAM HALL, *Appellants*.

(21 P. 2d 350.)

Opinion filed May 6, 1933.

*Fred A. Walker*, of Columbus, and *Frank Nesbitt*, of Miami, Okla., for the appellants.

*F. W. Boss, Marc G. Boss*, both of Columbus, and *A. C. Wallace*, of Miami, Okla., for the appellees.

The opinion of the court was delivered by

HARVEY, J.: This is an action for a declaratory judgment construing a mining lease. The trial court made findings of fact and rendered a judgment from which the lessees have appealed.

Plaintiffs, spoken of as the Wright heirs, owned in fee simple and as tenants in common two described tracts of land, containing lead and zinc, in Cherokee county. It had been leased for mining purposes, and large piles of chat were on the ground. On May 26, 1923, they leased the land to the Wright Mining and Royalty Company, a corporation, for a term beginning at the expiration of the lease then on the land and ending February 17, 1937, for mining purposes only. The possession and use of the land, for all "purposes inconsistent with the thorough and proper mining thereof," was reserved by the lessors. The lease provided that the lessee should,

itself or through its sublessee, "mine said land continuously in good faith and in a good workmanlike manner," unless the market price of zinc ore is less than $35 per ton, or delayed by unavoidable causes; that "the liberal terms of the lease" are predicated on lessee's agreement "to fully develop and make said land productive and to sink pump shafts and additional shafts . . . and .mine and operate the same continuously;" and lessee agreed to drain the land of water so as to "permit thorough mining thereof, in good faith;" to timber securely all shafts and drifts on the land. The ore from the land was to be sold, the lessors to have 12½ per cent of the gross price received; all ores were to be milled on the land, and the land should not be subleased at more than 15 per cent of the gross price received for the ore. Then occurs this paragraph— the latter part of which principally gives rise to the controversy here: .

"It is further agreed that no ores or rough stuff shall be brought from other lands and reduced and cleaned on said premises, and *all chats and tailings to be the property of parties of the first part,* except such as necessary for the buildings herein contemplated."

The lease gave lessee the right to erect all necessary buildings or machinery on the land for the purpose of mining, draining, crushing and cleaning ores thereon; the lessee agreed to keep a correct account of all minerals mined, the kind and weight thereof, and the lessors had "the right to go upon or into any mine and inspect all mining operations on or in said land." There was a provision respecting forfeiture, and lessee bound itself to the faithful performance of its provisions.

The Wright Mining and Royalty Company, March 12, 1925, sub-leased the lands for mining purposes to the Boska Mining Company, a corporation, for a term ending February 1, 1937, for 17½ per cent of the gross value of the ore produced before February 17, 1927, and 15 per cent after that date. The terms of the lease are much like those of the lease just referred to, except with respect to tailings and chats. "All tailings . . . shall be the property of the first party *after the first milling of the ore dirt;*" and "All uses of the land not necessary for the proper mining of lead and zinc ore . . . are expressly reserved" to first party "together with all *chat after the first milling of ore.*"

On June 4, 1925, the Wright Mining and Royalty Company, as the first party, and the Boska Mining Company, executed an instru-

ment called a "contract and lease" which referred to the lease between the parties, recited that in the operation of the mining plant it is believed a loss of ore is sustained from lack of milling facilities adapted for saving ore from slimes and sands that now escape and have heretofore escaped; that there is a large pond of slimes and a large sand pile believed to contain ore which might be saved by the use of a suitable flotation system, and that current loss of ore might be saved by a good flotation system; and it was agreed the second party would install a flotation system adapted to save ore now lost in the current operation of the mill, and in reclaiming and saving the ore from the sludge pond, the slimes and the sand pile, and first party granted to second party the right to reclaim or mill tailings in the sand piles and from the slimes and from all places where the same has been heretofore lost, the second party to pay royalties as in the lease. It appears this instrument was not recorded.

On February 7, 1931, the Wright heirs, plaintiffs in this action, as first parties, and the Cortez-King Brand Mines Company, executed a "Retreatment Contract" by which the first parties gave and granted to the second party the exclusive right to rerun and re-treat, for the purpose of recovering the mineral contents thereof, all tailings, chats, sands, slime, sludge and other mineral-bearing dirt on the surface of the land, for certain royalties to be paid. This instrument became exhibit D at the trial.

The controversy here is between the Wright Mining and Royalty Company and the Boska Mining Company, on one side, who claim the right to remill, or re-treat, the chats and tailings, and the Wright heirs and the Cortez-King Brand Mines Company on the other side, who claim such right exclusively. There has been some substitution of parties, but since that does not affect the legal question to be determined it need not further be noticed. The question presented turns on the construction of the lease, dated May 26, 1923, from the Wright heirs to the Wright Mining and Royalty Company, a synopsis of which has been given, and particularly upon the phrase therein, ". . . all chats and tailings to be the property of parties of the first part. . . ." There also was presented, at the trial of the action, a question of the operative interpretation of the lease with respect to the remilling or re-treating of chats and tailings, and a question of estoppel. At the trial the parties stipulated:

". . . that the words 'tailings' and 'chats,' wherever the same are used in

622

the pleadings or exhibits in this case, shall be held to mean all mine refuse that has been milled, irrespective of the number of times the same has been milled and irrespective of the location of such refuse, whether after the first milling or any other milling, and includes sands, sludge and slime.".

After hearing the evidence the court found (some findings are omitted because contained in the above statement), as facts:

"3. That in the year 1923, the date of this said lease, flotation plants were not a part of the regular equipment of lead and zinc mills in the tri-state mining field, and as late as 1925 they were just beginning to be installed in this field and were then in the experimental stage.

"4. That it is a matter of common knowledge in the tri-state district at this time, to wit, 1923, before the flotation system was used, that a large amount of good ore was not being recovered and was thrown upon the dumps or chat piles.

"6. That second-run ore, or float ore, is less valuable than first-run ore, and that both the landowner and the mining company would profit by a proper mining and cleaning of the ore so that the greatest recovery possible should be had by the first milling of the ore.

"7. That at the present time flotation systems, or plants, are considered a part of the standard equipment of the large mill and such flotation system is used in the cleaning of both 'ground ore' and 'float ore.'

"8. That the provision contained in the lease of May 26, 1923, between the Wright heirs and the Wright Mining and Royalty Company, as follows: 'And all chats and tailings to be the property of the parties of the first part,' is a reservation, reserving to the landowners the absolute title to all chats and tailings as soon as they become such; that the landowners were, by this reservation, vested with all of the rights incident to complete ownership, and the Wright Mining and Royalty Company and their successors, because of this reservation, lost any right therein or thereto, after the first milling.

"9. That A. J. Wright, one of the plaintiffs in this case, is an experienced mining man, but he was never on the lease in question but one time since 1925. He knew nothing about the installation of the plant to rerun chats until shortly before the Boska Mining Company was told by Russell Jarrett that the heirs objected to the rerunning of the chats. He did, however, know of the flotation system being installed after its installation, in the year 1924 [1925], and he also knew the nature and character of this type of equipment.

"10. Lester M. Jarrett and Russell S. Jarrett were often on the lease. Both, at different times, had been employed by the other Wright heirs to go to the property to check up the records of production. They were never the general agents of the heirs, and their authority extended only to checking the records and to see that the Wright heirs were getting the royalty which was due them as shown by the records of production.

"11. There is no evidence in this case that any of the Wright heirs, or tenants in common, knew anything about the conduct, operation or equipment used upon this lease, or that they had any experience in the mining or cleaning of minerals.

"12. That all of the Wright heirs knew, or should have known, that they

were receiving royalties for float ore, but did not know where the ore was coming from. They did not know that the Boska Mining Company was re-running the chats until in June, 1929.

"13. That none of the Wright heirs knew that the Boska Mining Company was constructing equipment to rerun the chats until the same had been constructed and in operation. In June, 1929, Russell S. Jarrett notified the Boska Mining Company to stop rerunning the chats. The company, however, continued to run the chats until in December, 1929, when they closed down the mill on account of the cold weather and the resultant freeze, and have never operated since that time because the price of ore has not justified their operation, it having been below $35.00 per ton as provided for in the lease for cessation of operations.

"14. That the landowners herein, the Wright heirs, are the owners of the tailings and entitled to possession thereof, subject only to their contract (exhibit D) with the Cortez-King Brand Mines Company."

The court's conclusions of law read:

"1. The contract between the landowners and the Wright Mining and Royalty Company is clear and unambiguous and capable of legal construction. Evidence of custom, therefore, is incompetent and was not considered by the court.

"2. The plaintiffs, by their conduct, are not estopped to deny the right of the Boska Mining Company to rerun the tailings.

"3. The clause 'all chats and tailings to be the property of the first party' is a reservation in the lease, reserving to the landowners the complete ownership in the same after they become chats and tailings; that is, after the first running of the ore.

"4. That since the landowners reserved the title in the chats and tailings to themselves, the Boska Mining Company did not inure to any right to rerun same by any contract with the Wright Mining and Royalty Company.

"5. That the landowners had the right to sell or convey the chats and tailings after the first run of the ore-bearing rock through the mill, and their contract, exhibit D, is valid and vests the right to rerun the tailings, as per contract, in the said Cortez-King Brand Mines Company.

"6. That the absolute right to mine on the premises in question is vested in the defendant, Boska Mining Company, subject only to the reservation of the 'chats and tailings' by the landowners as interpreted by this decision."

Judgment was rendered in favor of plaintiffs and the Cortez-King Brand Mines Company. The defendants, the Wright Mining and Royalty Company and the Boska Mining Company, have appealed.

Appellants present and argue three questions:

"Point I. *The terms of the mining lease itself show* that the reservation of the property right in the chats and tailings does not restrict the number of times lessees may remill or rerun the chats and tailings to extract ores therefrom.

"Point II. *The conduct of the parties has been such as to show their own construction* of the reservation of the property rights in the chats and tailings does not restrict the number of times lessees may remill or rerun the chats and tailings to extract ores therefrom.

"Point III. *The conduct of the parties, proceeding under the mining lease, has been such as to estop* lessors from denying lessees' right to remill or rerun the tailings as many times as necessary to extract the ores therefrom."

The second and third of these questions necessarily were determined from the oral testimony produced at the trial. The findings of the trial court are against appellants on these points. We have examined the testimony and find there is an abundance of it to support the findings. They are, therefore, binding in this court. (*Lambert v. Rhea,* 134 Kan. 10, 4 Pac. 2d 419; *Carpenter v. Aldridge,* 133 Kan. 465, 300 Pac. 1065.) It would serve no useful purpose to detail the testimony in this opinion.

This leaves but the first question above presented for our consideration. As to this the argument centers about the phrase in the lease, "all chats and tailings to be the property of parties of the first part." The chats and tailings had a value, aside from their mineral content, for use in constructing buildings, surfacing highways and the like. Appellants say this phrase simply recognizes the right, or property right, to use the chats for other than mining purposes to be in the lessors—except as the lessees might use them for constructing necessary buildings on the lease—and appellants say they are not claiming any property right in the chats any more than they do in the ore or other substance of the land; that all they are claiming is the right to extract the lead and zinc from it as they would from other mineral-bearing ore or dirt found in or upon the land. If this is all the phrase means, it might well have been omitted from the lease. The lease without it would have been construed the same as appellants now contend it should be construed with this phrase a part of it. (*Erwin v. Hoch,* 7 Sad. [Pa.] 477, 12 Atl. 149; *Doster v. Zinc Co.,* 140 Pa. St. 147, 21 Atl. 251.)

Appellants contend that the lease should be construed as a whole to determine the meaning of the parties. This is correct. (*Howerton v. Gas Co.,* 81 Kan. 553, 557, 106 Pac. 47; *Berg v. Scully,* 120 Kan. 637, 245 Pac. 119.) They further contend that, construing the lease as a whole, it is clear the principal interest the lessors have therein is the royalty they expect on lead and zinc mined and sold; that the lease contains many phrases and expressions requiring thorough and diligent operation, continuous and faithful performance, and

full development to make the lands productive. An examination of the lease, however, discloses that these terms are used in connection with sinking shafts, additional shafts, proper drainage, and the erection of necessary buildings and machinery for the purpose of mining, draining, crushing and cleaning ores. None of these general provisions indicates that the parties contemplated that the lessees would remill or re-treat chats and tailings, nor is there anything in them which pertains specifically to minerals on the surface of the land, but on the other hand they do apply specifically to shafts and underground mining. The only phrase in the lease dealing specifically with material on the surface of the land is the phrase, "all chats and tailings to be the property of parties of the first part." We see no reason to place a limitation on the meaning of the word "property" as used in this phrase, which is tantamount to absolute ownership, with full right to possession and use, to the exclusion of such rights in any other person. (2 Bl. Com., ch. 1, p. 2; *St. Louis v. Hill*, 116 Mo. 527, 22 S. W. 859.) At the time this lease was made, in 1923, it was thought the chats and tailings contained considerable lead and zinc, but there was no known method in practical and common use for separating the minerals and making them commercially valuable. It cannot reasonably be said that the re-treatment of these chats and tailings was then within the contemplation of the parties. In this respect it was much like the situation in *Kaul v. Weed*, 203 Pa. St. 586, 53 Atl. 489. There an owner of timber conveyed by deed "all and all manner of timber, down and standing, except hemlock timber" thereon. The grantees under the deed cut all of the timber except the hemlock above a certain diameter. When the deed was executed there were no chemical factories in the county, and no chemical or pulp wood was cut by the grantees until after all the trees fit for timber had been cut and the logs removed. Thereafter the grantees cut trees for chemical and pulp purposes. Held, they had no right under the deed to do so, and were liable to the grantors therefor.

Appellants cite *Giersa v. Creech*, 181 S. W. 588 (Mo. App., not officially reported). There the lease gave the lessee the right of "digging, mining, and carrying away lead and zinc ores, or other ores, of whatsoever nature or description, which may be found in, on, or under said lands," and provided for the payment of royalty on the ores "to be extracted from said premises." It was held that

the lease gave the right to clean up and market ores mined ten or twelve years previously and thrown on the dump. But there the terms of the lease were much broader than they are in this case, and there was no specific reservation of the dump, as there is here of the chats and tailings. *Marvin v. Brewster Iron Mining Co.*, 55 N. Y. 538, cited by appellants, deals with an entirely different situation and is not in point.

We conclude the court below correctly construed the lease in question, and its judgment should be affirmed. It is so ordered.