No. 29,793.

Dora O. Lambert and Frederick C. Lambert, Carl M. Lambert, Theodore F. Lambert and Harvey E. Lambert, Minors, by Dora O. Lambert, Their Mother and Next Friend, *Appellants*, v. Robert Rhea, *Appellee.*

(4 P. 2d 419.)

Opinion filed November 7, 1931.

*Robert H. Clogston,* of Eureka, for the appellants.

*G. H. Lamb, W. E. Hogueland,* both of Yates Center, and *Joe Rolston,* of Burlington, for the appellee.

The opinion of the court was delivered by

Johnston, C. J.: This action was brought by Dora O. Lambert for herself and the children of herself and her husband, Claude K. Lambert, against Robert Rhea, to recover damages for alleged negligence in causing the death of Claude K. Lambert. Plaintiffs failed to recover damages and are prosecuting this appeal.

In their petition it is alleged that on September 29, 1927, Claude K. Lambert was employed by Rhea to dip sheep in a dipping vat provided by Rhea, and that Lambert and two other employees dipped about 700 sheep on that day. It is alleged that Rhea furnished a solution for the dipping of the sheep of what is called Black Leaf 40, which it is said contained nicotine sulphate, the active elements of the mixture being forty per cent nicotine and sixty per

cent of other ingredients, including water, and that these were put in the vat under the direction of Rhea; that in dipping the sheep Lambert got some of the solution on his clothing, hands and face, and did inhale and absorb in his body parts of the solution, and as a consequence was made ill from the poisonous effect of the mixture, which affected his lungs, throat, abdomen, blood vessels, causing him to vomit excessively shortly after the dipping, and ultimately causing the death of Lambert.

It was further alleged that Rhea had previously used the solution and knew that it had made some of the operators sick, and that he was acquainted with the poisonous effect of it; also that Rhea had furnished a covering for Lambert's clothes, but that it was of such a texture as to afford no protection, and this was or should have been known to Rhea; also that Rhea failed to inform Lambert, who had no experience with such a mixture, of antidotes or remedies for illness arising from the use of the solution. Plaintiffs therefore prayed that for the negligence alleged they were entitled to recover damages in the sum of $10,000.

The defendant answered with a general dénial and averments to the effect that when Lambert was employed he was apparently a strong, able-bodied man, that he had requested employment, that he had had experience in handling and dipping sheep and was familiar with the dips used and had made dips himself, and that defendant, believing his representations that he had had experience, employed him. He further alleged that he informed Lambert of the kind of dip he was using and that Lambert replied that he was familiar with the same and had lots of experience in its use. He further alleged that after Lambert quit work on that day he ate a hearty supper in the home of the defendant and then was driven to his home in Yates Center, a distance of about fifteen and a half miles, and at the end of the ride he informed the defendant that he was feeling all right, and he said that while tobacco made some people sick, it never had made him sick. The defendant alleged that he had furnished an oilcloth apron or covering to protect the clothing of Lambert, that rubber boots were worn which protected him from having any of the dip splashed on him, and denied that Lambert's clothing became saturated with the dip. He specially denied that the dip used by the defendant in the dipping of the sheep by Lambert was the proximate cause of his death.

There was testimony to the effect that on the night of the day he worked for Rhea, and after reaching his home, he began vomiting, which lasted until four o'clock in the morning. Two hours later he died. A doctor was called about one o'clock and left medicine which was administered to him. There was testimony, too, that the solution used had made others sick.

On the part of the defendant, he testified to the employment of Lambert, and that Black Leaf 40 was used, it came in gallon cans and the sheep were submerged in the vat for two minutes. He prepared the solution according to the directions printed on the cans. Mrs. Rhea testified that she talked with Lambert about dipping and the use of Black Leaf 40, and he told her that he wasn't afraid of it making him sick.

One of the doctors called by plaintiff, who had had charge of men in the world war, testified that he had become familiar with gas poisons and had read about nicotine as a poison and classed it as one of the dangerous and active poisons paralyzing respiratory centers and indirectly affecting the heart, and from a hypothetical question he expressed the opinion that Lambert came to his death as a result of breathing this nicotine or inhaling it while working and dipping sheep.

Other doctors testified to the contrary. A post-mortem examination of the body of the deceased was held and they found a coronary embolism. The coronary artery is located in the walls of the heart, and that is where the embolism was found. The autopsy showed that it was a clot. The heart seemed to be in a normal state. No hemorrhage was found and nothing other than the clot. This autopsy was made the morning he died.

Doctor Salisbury was called as a witness and was asked to testify as to the effect of nicotine upon a human being. He said that nicotine acted very quickly and that it acted quickly upon all human beings and all animals, and is fatal poison. He said that one who is poisoned with nicotine would find that it acted upon him in not to exceed thirty minutes. As to the cause of Lambert's death he testified that it was what is called coronary embolism. He stated there are a couple of arteries that supply the blood to the heart and that a blood clot would plug up one or both of these arteries, sometimes hardened arteries would cause it, and of course that is fatal. It is the plugging of the arteries that supply the heart with blood.

It may form in the arteries, or it may drift and form some other place. Death from this cause is common in this country. Basing his opinion upon the evidence that he had heard from the witnesses, he stated, as to the dipping of the sheep from 10 o'clock in the morning until noon, taking an hour off and eating dinner and then going back and working until about 6:20, then eating his supper and going in a car and driving to town about 9 o'clock and becoming sick about an hour afterwards, he would think that the nicotine had nothing to do with it. On the testimony he stated it appeared that this man went for several hours before he showed any signs of vomiting, and this was too long to warrant the blaming of it on nicotine.

Another doctor, named Murphy, on a hypothetical question reciting the principal testimony in the case, stated that embolism was the cause of the death, and it would be contrary to all authorities that it was caused by nicotine poisoning.

Dr. A. C. Dingus testified that nicotine was a swift-acting poison, and that a person affected by nicotine would die before the expiration of six or seven or eight hours and that, having reference to the testimony as to what was done by Lambert, his judgment would be that it was a coronary embolism that caused his death and that it was not caused by nicotine. Doctor Reynolds gave like testimony.

The plaintiff contends that the evidence establishes that the death of Lambert was caused by the nicotine sulphate and not by an embolism, and also that the court erred in overruling plaintiffs' motion for a new trial.

The appeal raised mainly a question of fact which had been submitted to and decided by the jury. Some testimony was given in support of plaintiffs' theory that the death was caused by nicotine poison, but there was substantial evidence to the contrary—much more, in fact, which apparently was credible—that death resulted from another cause. There was competent evidence to the effect that the nicotine is a deadly poison which acts swiftly when taken into the system either by inhalation or through the mouth. According to some testimony produced, if the illness and death of Lambert had been the result of nicotine poisoning, the effect of it would have been manifest within thirty minutes after it entered the system, while Lambert, it was shown, worked through the day, eating a hearty dinner at noon, afterwards continuing the dipping until about 6 in the evening, when he ate another meal. After that he

traveled in an automobile a distance of about fifteen miles, and during all this time he had no symptoms of poisoning, and then declared that he was hearty and well. The attack of illness came upon him the following night and his death ensued in a few hours. Doctors testified that the death was caused by an embolism, and not from poison, and that the embolism was not the direct or indirect result of nicotine sulphate. The evidence of defendant, conflicting as it was with that of plaintiffs, convinced the jury that nicotine poison was not the cause of Lambert's death. It was the controlling question in the case and was one for the trier of the facts to determine. Their finding and verdict, being based on competent evidence, ends any dispute as to the fact.

Plaintiffs criticize some of the instructions given by the court. It is said that some were too general and not sufficiently full; the incorporation of portions of the pleadings in the instructions; that they were indefinite and needed explanation; that they did not contain a statement as to the duty of the defendant to provide plaintiff a safe place to work, and that some were indefinite and not founded on evidence. It may be stated that all of the instructions given are not preserved in the record, nor is there anything to show what may or what may not have been included in those not brought here. It devolves on the appellant to complete the record and either bring up all the instructions or a statement in the record that those omitted did not include anything pertaining to the matter presented for review. (*Hallwood Co. v. Dailey,* 70 Kan. 620, 79 Pac. 158; *Holderman v. Hood,* 78 Kan. 46, 96 Pac. 71.) Although plaintiffs complain that instructions were incomplete and should have included some additional matter, they did not request or suggest any additions or modifications of those given. Plaintiffs stood by without making objections, and not asking for modifications or additions they allowed the court and defendant to understand that they were satisfied with the charge. If a party thinks an instruction is not as full as it might be he should in fairness to the court point out the lack and request the additional matter, and if he fails to do this he has no right to complain. In *Foley v. Crawford,* 125 Kan. 252, 264 Pac. 59, it was said:

"Complaint that instructions given should have included additional matters is unavailing in the supreme court where the instructions given did not incorrectly state the law and where no objection was made to any of them, no modification of any of them was suggested or no special instruction was requested." (Syl. ¶ 10.)

See, also, *Briley v. Nussbaum*, 122 Kan. 438, 252 Pac. 223; *Swan v. Smith*, 124 Kan. 252, 259 Pac. 801; *Cage v. Stalker*, 131 Kan. 417, 292 Pac. 773.

Notwithstanding the defects in the record, the court has examined the instructions that were preserved, and finds them to be quite full and definite as to the issues involved and not open to the objections made. Having upheld the finding as to the cause of the death, the other grounds of negligence alleged as to not furnishing protection from poison are manifestly immaterial.

The judgment is affirmed.