NOT DESIGNATED FOR PUBLICATION

No. 116,030

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JULIO XAN SAQUIC,
*Appellant*.


MEMORANDUM OPINION


Appeal from Seward District Court; LINDA P. GILMORE, judge. Opinion filed November 22, 2017. Affirmed.


*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.


*James Crux*, assistant county attorney, *Russell Hasenbank*, county attorney, and *Derek Schmidt*, attorney general, for appellee.


Before SCHROEDER, P.J., MCANANY and POWELL, JJ.


PER CURIAM: Jose Ramos was run over and killed by a vehicle operated by Julio Xan Saquic, prompting the State to charge Saquic with, among other things, involuntary manslaughter while driving under the influence of alcohol and driving under the influence of alcohol. A jury found Saquic guilty of all the charges. At sentencing, the district court dismissed the conviction for driving under the influence of alcohol as being multiplicitous with Saquic's involuntary manslaughter conviction. Saquic now appeals his convictions, arguing two jury instruction errors and claiming there was insufficient evidence to support his convictions. Finding no error, we affirm.

1

At 11:31 p.m. on January 24, 2015, Officer Mark West with the Liberal Police Department responded to a call about a man lying in the street near 8th and New York. West located the body of Ramos near the intersection of 10th and New York at 11:35 p.m. Ramos' body appeared to have sustained injuries consistent with being run over by an automobile. Ramos had tire marks across his body, and the roadway had acceleration marks on both sides of his body. Ramos had elongated abrasions over his lower abdomen and patterned injury from contact with the pavement during the trauma, commonly known as road rash. The victim's shoes were located mid-way along this acceleration path, indicating that someone attempted to remove the body from under a vehicle. Ramos' body appeared to have been dragged 20 to 30 feet with skin, muscle, and bone on the roadway. Vomit was also present near the northern-most acceleration markings. Ramos was deceased.

Detective Jason Ott and Officer Nancy Baez were dispatched to the scene. Baez canvassed the neighborhood and eventually made contract with Esteban Ramirez and Gasper Ramirez, who told Baez that they had thrown a party earlier that day and gave her information about one friend who had attended the party, including his name, address, and vehicle information. Baez, Ott, and West then drove to the address provided by Esteban and Gasper and watched the residence. Around 2:30 a.m., two men arrived at the residence in a taxi, and Baez began questioning them. One of these men was Saquic; the other man was identified as Pedro Ralios.

Saquic and Ralios informed Baez that they were indeed at the party hosted by Esteban and Gasper. After leaving the party, Saquic and Ralios stated they went to a bar and then went to a club. When asked about his vehicle, Saquic stated he drove his red 1998 Mitsubishi Eclipse from the party hosted by Esteban and Gasper to the bar and then to the club but had left the car at the club. Saquic appeared to be intoxicated while

speaking with Baez—he had slurred speech, bloodshot eyes, and smelled of alcohol. Baez transported Saquic to the Liberal Police Department.

At the station, Lieutenant John McCord interviewed Saquic; Baez acted as an interpreter. Saquic informed McCord he did not have a driver's license and that he threw up outside immediately upon leaving the house where the party was hosted because he was drunk. Saquic admitted he had four beers and four shots of whiskey and stated he left the party around 11 or 11:30 p.m.

Ott located Saquic's car at the club, as Saquic had indicated, and found what he believed to be blood splattered down the driver's side of the vehicle and hair under the driver's side tire. There was also vomit on the outside of the driver's side door and inside the vehicle. Ott found a half-full bottle of whiskey on the passenger's floorboard. The vehicle's license plate frame was broken on the top and bottom, but there was no blood or hair on the license plate. Additionally, there was no damage to the vehicle's hood, windshield, or roof. Ott requested an evidence technician obtain samples from the vehicle.

The evidence technician collected swabs of the blood, vomit, and hair on the vehicle, and they were sent to the Kansas Bureau of Investigation (KBI); the car was transported to the Liberal Police Department garage for further investigation. The technician also collected blood samples from Ramos during his autopsy and sent the samples to the KBI. The blood found on Saquic's car belonged to Ramos.

On January 26, 2015, Ott interviewed Saquic regarding the events of the night of January 24, 2015, with the assistance of an interpreter. Saquic told Ott he arrived at the party around 2:30 p.m. and that he left and returned to the party a couple of times in order to purchase more alcohol. He stated he consumed four shots of whiskey and a mixed drink but did not specify how much beer he consumed. Saquic confirmed his previous

3

statements that he was driving and that he left the party around 11 or midnight, backed out of the driveway headed south, and immediately vomited. Ott asked Saquic how Ramos' blood and hair got on his vehicle, and Saquic responded that maybe he had driven over the blood and hair but that he never felt a bump of running over someone.

Dr. Hubert Peterson performed an autopsy on Ramos on January 26, 2015. After examining the body, Peterson determined the cause of death was a combination of massive injuries—predominantly located in the left-chest region—and that Ramos' injuries were consistent with being run over by an automobile. Ramos' preliminary blood alcohol level was "333 milligrams percent," which is clearly higher than the legal limit for driving of 80 milligrams percent. Peterson testified that the level for fatal alcohol poisoning varies according to the person, with lower levels beginning at 296 milligrams percent, and higher levels reaching the 700s milligrams percent. Ramos also had traces of cocaine in his system at the time of his death. Peterson located superficial bleeding over the surface of Ramos' brain with no signs of penetrating trauma. Peterson testified such superficial bleeding is not likely to result from hitting one's head while falling because such an injury requires more severe trauma; however, he testified that it is conceivable one could possibly receive such an injury by falling. When asked, Peterson testified that, all things considered, the situation could be consistent with Ramos passing out in the street; however, the cause of death was Ramos' massive injuries consistent with being run over by an automobile.

The State charged Saquic with one count each of involuntary manslaughter while driving under the influence of alcohol or drugs, a severity level 4 person felony; failure to stop and remain at the scene of an accident resulting in death, a severity level 6 person felony; driving without a driver's license, a class B unclassified misdemeanor; and driving under the influence of alcohol or drugs, a class B nonperson misdemeanor.

The jury found Saquic guilty of all four charges, but, at sentencing, the district court dismissed the conviction for driving under the influence of alcohol as being multiplicitous with Saquic's involuntary manslaughter conviction. Saquic was sentenced to 71 months' imprisonment with 36 months' postrelease supervision.

Saquic timely appeals.

DID THE DISTRICT COURT ERR IN THE INSTRUCTIONS GIVEN TO THE JURY?

On appeal, Saquic argues that the district court erred by not instructing the jury on the matter of the causation of Ramos' death and not instructing the jury that driving under the influence is a lesser included offense of involuntary manslaughter while driving under the influence of alcohol.

"'For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* [565 U.S. 1221] (2012).'" *State v. Woods*, 301 Kan. 852, 876, 348 P.3d 583 (2015) (quoting *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 [2012]).

The issue of preservation must first be addressed.

"K.S.A. 22-3414(3) establishes a preservation rule for instruction claims on appeal. It provides that no party may assign as error a district court's giving or failure to

5

give a particular jury instruction, including a lesser included crime instruction, unless: (a) that party objects before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds for objection; or (b) the instruction or the failure to give the instruction is clearly erroneous. If an instruction is clearly erroneous, appellate review is not predicated upon an objection in the district court." *State v. Williams*, 295 Kan. 506, Syl. ¶ 3, 286 P.3d 195 (2012).

Saquic's trial counsel did not object to the jury instructions on these points, nor did his counsel request either of these instructions. Thus, we review these alleged errors for clear error. 295 Kan. 506, Syl. ¶ 3.

A clear error determination requires a review of the impact of the erroneous instruction in light of the entire record including the other instructions, counsels' arguments, and whether the evidence is overwhelming. See *In re Care & Treatment of Thomas*, 301 Kan. 841, 849, 348 P.3d 576 (2015). To establish clear error, "'the defendant must firmly convince the appellate court that the giving of the instruction would have made a difference in the verdict.' [Citation omitted.]" *State v. Cooper*, 303 Kan. 764, 771, 366 P.3d 232 (2016).

A.  *Jury instruction on the causation of Ramos' death*

A jury instruction must be both legally and factually appropriate. See *Woods*, 301 Kan. at 876. Here, the State concedes that a causation instruction was legally and factually appropriate under *State v. Collins*, 36 Kan. App. 2d 367, 138 P.3d 793 (2006). In *Collins*, this court held: "A conviction of the crime of involuntary manslaughter while driving under the influence of alcohol . . . requires evidence that the conduct of the defendant was the cause of the victim's death." 36 Kan. App. 2d 367, Syl. ¶ 2.

However, the State argues that such failure to provide a causation jury instruction was harmless error because the jury was given the opportunity to convict Saquic of the

6

lesser included crimes of vehicular homicide or simply operating a vehicle while under the influence of alcohol. Because Saquic did not object to or request this instruction, we must be "'firmly convince[d] . . . that the giving of the instruction would have made a difference in the verdict.'" *Cooper*, 303 Kan. at 771.

Here, Saquic makes much of the issue that Ramos' blood alcohol was in the range of possible fatal alcohol poisoning. However, Dr. Peterson testified that the cause of death was Ramos' massive injuries consistent with being run over by an automobile. Although a possibility existed that Ramos *may* have been passed out in the street, evidence of the direct cause of his death was presented to the jury: Saquic's vehicle struck Ramos; dragged his body 20 to 30 feet; and his massive trauma injuries, consistent with being struck by a vehicle, caused his death. The jury was presented with evidence of Ramos' conduct and still convicted Saquic of the most severe charges for which it was instructed. Saquic does not make a firmly convincing showing that had the jury received a causation instruction it would have reached a different verdict. There was no clear error.

B.      *Jury instruction on driving under the influence as a lesser included offense of involuntary manslaughter while driving under the influence of alcohol*

The jury instruction for involuntary manslaughter read:

"The defendant is charged with involuntary manslaughter. The Defendant pleads not guilty.
"To establish this charge, each of the following claims must be proved:
"1. The defendant killed Jose Ramos.
"2. It was done in the commission of driving under the influence of alcohol.
"3. This act occurred on or about the 24th day of January, 2015 in Seward County, Kansas.
"The elements of driving under the influence of alcohol are listed in Instruction No. 9."

7

The jury was also given a reasonable doubt instruction, an instruction on vehicular homicide, and the following instruction:

> "Each crime charged against the defendant is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it, uninfluenced by [your] decision as to any other charge. The defendant may be convicted or acquitted on any or all of the offenses charged. Your finding as to each crime charged must be stated in a verdict form signed by the Presiding Juror."

The jury ultimately convicted Saquic of both driving under the influence while intoxicated and involuntary manslaughter while driving under the influence of alcohol. However, at sentencing, the district court dismissed Saquic's conviction for driving under the influence of alcohol as being multiplicitous with the involuntary manslaughter conviction. Any error for failing to instruct the jury on driving under the influence as a lesser included offence of involuntary manslaughter was rendered moot by the district court's dismissal of Saquic's driving under the influence conviction. See *State v. Montgomery*, 295 Kan. 837, 840, 286 P.3d 866 (2012) ("A justiciable controversy has definite and concrete issues between the parties and 'adverse legal interests that are immediate, real, and amenable to conclusive relief.' [Citation omitted.]").

Additionally, assuming without deciding that such an instruction was legally and factually appropriate, the jury was given a reasonable doubt instruction, a vehicular homicide instruction, and an instruction that each charge was distinct and separate. If the jury had any reasonable doubt as to Saquic's guilt concerning the involuntary manslaughter while driving under the influence of alcohol charge, it would have found Saquic guilty of vehicular manslaughter or not guilty. Additionally, the jury was instructed that each charge was a separate and distinct offense and that it must not be influenced in its verdict on one charge by its decision on the other charges. This instruction undermines Saquic's argument. Saquic does not make a firmly convincing

8

showing that had the jury received a lesser included offense instruction, it would have reached a different verdict. There was no clear error.

DOES SUFFICIENT EVIDENCE SUPPORT SAQUIC'S CONVICTIONS?

Saquic's second argument is that there was insufficient evidence to support his convictions of involuntary manslaughter while driving under the influence of alcohol and failing to stop and remain at the scene of an accident resulting in death.

"'When the sufficiency of the evidence is challenged in a criminal case, this court reviews the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' [Citation omitted.]" *State v. Rosa*, 304 Kan. 429, 432-33, 371 P.3d 915 (2016).

"'In making a sufficiency determination, the appellate court does not reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility.' [Citations omitted.]" *State v. Dunn*, 304 Kan. 773, 822, 375 P.3d 332 (2016). It is only in rare cases where the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed. See *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

A.    *Sufficiency of the evidence supporting Saquic's involuntary manslaughter while driving under the influence of alcohol conviction*

Saquic argues there was insufficient evidence to support his conviction of involuntary manslaughter while driving under the influence of alcohol because Ramos was responsible for his own death.

9

A conviction of involuntary manslaughter under K.S.A. 2016 Supp. 21-5405(a)(3) requires the killing of a human being committed in the commission of driving under the influence.

Here, there was sufficient evidence to support Saquic's conviction of involuntary manslaughter while driving under the influence of alcohol. The body of Ramos was found in the street with injuries consistent with being run over by an automobile. Blood from the victim was found on the driver's side of the vehicle and underneath the vehicle near the tire. Saquic stated that he left the party between 11 p.m. and midnight and drove his vehicle from the party to the bar and then to the club, and that he was intoxicated while driving. Although Ramos' blood alcohol was within the range for fatal alcohol poisoning and it was a possibility that he passed out in the road, this does not change the fact that being ran over was the last act upon which death could be determined. The jury heard evidence of both possible scenarios and found the scenario in which Saquic caused the death of Ramos by running over him to be more credible. It is not our place to reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility. See *Dunn*, 304 Kan. at 822. There was sufficient evidence to support Saquic's conviction of involuntary manslaughter while driving under the influence of alcohol.

B.    *Sufficiency of the evidence supporting Saquic's failing to stop and remain at the scene of an accident resulting in death conviction*

Saquic also argues there was insufficient evidence to support his conviction of failing to stop and remain at the scene of an accident resulting in death because the State failed to prove Saquic killed Ramos, and, therefore, there was no obligation for him to remain at the scene.

A conviction of failing to stop and remain at the scene of an accident resulting in death requires that the driver of the vehicle be involved in an accident; that the accident resulted in the death of a human being; that the driver failed to immediately stop and remain stopped at the scene of the accident; and that the driver knew or reasonably should have known that the accident resulted in death or injury. See K.S.A. 2016 Supp. 8-1602(a), (b)(5).

Here, there was sufficient evidence to support Saquic's conviction of failing to stop and remain at the scene of an accident resulting in death. Saquic admitted to driving his vehicle from the party, which was located very close to the scene of the accident, and to the bar. Obviously, he did not remain at the scene because he was not at the scene when West responded to the call about a man lying in the street. Saquic left the party between 11 p.m. and midnight. He admitted that he threw up immediately after leaving the party because he was drunk. Ramos received injuries consistent with being run over by an automobile that resulted in his death. Blood samples from Saquic's car body and tire belonged to Ramos. Saquic told officers that he did not remember feeling the bump of running over someone, but he was intoxicated at the time of the accident. Ramos' body and the road around it had vehicle acceleration marks. Further, there was evidence at the crime scene that the body had been pulled, or an attempt had been made to pull it, out from under the vehicle because Ramos' shoes were removed from his body. Even though Saquic told the officers he did not feel a bump, he acted recklessly by consciously disregarding the substantial and unjustifiable risk that could result when he chose to drive while intoxicated. He reasonably should have known something was wrong and that he had hit something in the road when he had to push the gas to the point of leaving acceleration marks on the road and Ramos' body or when there was an attempt to pull the body from under the vehicle. There was sufficient evidence to support Saquic's conviction of failing to stop and remain at the scene of an accident resulting in death.

Affirmed.

11