NOT DESIGNATED FOR PUBLICATION

No. 114,799

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MARKIS D. MITCHELL-BOYLES,
*Appellant*.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; GUNNAR A. SUNDBY, judge. Opinion filed January 13, 2017. Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Joan Lowdon*, assistant county attorney, *Todd Thompson*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, C.J., GREEN and LEBEN, JJ.

*Per Curiam*: Following a jury trial, Markis D. Mitchell-Boyles was convicted of aggravated assault, criminal in possession of a firearm, interference with a law enforcement officer, and criminal threat. On direct appeal, Markis argues that he is entitled to reversal of his convictions for two reasons. First, Markis argues that the prosecutor made an improper comment during rebuttal to his closing, which was not harmless. Second, Markis argues that the trial court instructed the jury against nullification. Nevertheless, both of Markis' arguments lack merit. Accordingly, we affirm.

1

On January 6, 2015, shortly after midnight, Sheena Mitchell, Markis' wife, called 911 alleging that Markis had threatened her with a gun in their shared two-story apartment. Later, Sheena would testify that Markis was angry with her because he believed that she had been flirting with another man. Following the 911 call, police arrived at the apartment and attempted to arrest Markis, but Markis had fled. Sheena then told the police that Markis had touched her arm forcibly, prevented her from leaving the apartment, told her that he was going to kill her, and pointed his gun at her while pulling the trigger twice. Police found a gun on the bedroom floor, and it contained no ammunition.

When police eventually arrested Markis, the State charged him with the following: aggravated assault, a severity level 7 person felony in violation of K.S.A. 2015 Supp. 21-5412(b)(1); criminal in possession of a firearm, a severity level 9 nonperson felony in violation of K.S.A. 2015 Supp. 21-6304(a); interference with a law enforcement officer, a severity level 9 nonperson felony in violation of K.S.A. 2015 Supp. 21-5904(a)(3); criminal threat, a severity level 9 person felony in violation of K.S.A. 2015 Supp. 21-5415(a)(1); criminal restraint, a class A misdemeanor in violation of K.S.A. 2015 Supp. 21-5411; and domestic battery, a class B misdemeanor in violation of K.S.A. 2015 Supp. 21-5414(a)(2).

On February 2, 2015, Markis' preliminary hearing was held. The State presented testimony from Sheena and one of the responding police officers, Sergeant Richard Fairbanks. Sheena, who had been subpoenaed, reluctantly testified.

Sheena testified that while she and Markis were working their shifts at IHOP, Markis became angry with her because he believed she was flirting with another man. Sheena explained that Markis' shift was over before her shift, so he went home. Sheena testified that once Markis got home, they began arguing by way of texts. Sheena testified that when she got home, a little after 6 p.m., Markis was still angry and very intoxicated.

According to Sheena, she tried sleeping in her and Markis' second-floor bedroom, but when Markis woke her up, he continued his verbal argument with her. Sheena testified that she believed Markis had awakened her about 11:30 p.m. on January 5. Sheena testified that during the fight that ensued, Markis touched her arm, yelled that "people were going to die," and grabbed his gun from somewhere in their bedroom. Sheena testified that Markis took the gun, pointed it at her, and pulled the trigger two times. Sheena explained that she heard two clicks when Markis pulled the trigger. Sheena additionally testified that Markis scared her.

Sergeant Fairbanks testified that he responded to a call that a man had threatened to kill a woman with a gun. Sergeant Fairbanks testified that when he arrived at the apartment, a frightened woman, whom he later learned was Sheena, opened the apartment door for him and two other officers—Officer Thomas Reynolds and Officer Trevor Osen. Sergeant Fairbanks explained that he, Officer Reynolds, and Officer Osen believed Markis was in the second-floor bedroom based on noises coming from that direction and Sheena's statements. Yet, Sergeant Fairbanks explained that when they entered the bedroom, Markis was not there. They did, however, find a gun lying on the bedroom floor. Sergeant Fairbanks explained that he, Officer Reynolds, and Officer Osen believed that Markis had jumped out of an open bedroom window. Moreover, it had been snowing, and there were marks in the snow below the window where it appeared that someone had landed.

According to Sergeant Fairbanks, Sheena told them that Markis had been wearing a red tank top, black pants, and no shoes. Sergeant Fairbanks testified that he and Officer Reynolds began searching for Markis. Sergeant Fairbanks explained that about 30 to 45 minutes later, he saw a man matching Markis' description behind the Dairy Queen. Sergeant Fairbanks explained that multiple police, including himself, Officer Reynolds, and Officer Osen, started chasing this man on foot while yelling "Stop, police." Sergeant

3

Fairbanks testified that police eventually tackled and arrested the man. It is undisputed that the man the police tackled and arrested was Markis.

Markis did not present any evidence on his own behalf at his preliminary hearing. The trial court bound Markis over on all counts.

On June 29-30, 2016, Markis' jury trial was held. During the trial, the State presented evidence from Sheena, Sergeant Fairbanks, Officer Reynolds, Officer Osen, and Detective Manuel Olmos. Sergeant Fairbanks mostly repeated his testimony from the preliminary hearing. Moreover, Officer Reynolds' testimony and Officer Osen's testimony mostly covered the same information as Sergeant Fairbanks' preliminary hearing testimony. That is, both Officer Reynolds and Officer Osen testified to the following: that they had responded to a 911 call that a man, Markis, had threatened a woman, Sheena, with a gun; that Sheena had let them into the apartment; that Sheena had looked visibly upset; that they had believed Markis was upstairs in the bedroom, but he was not; that they had found a gun on the bedroom floor; that they had believed Markis jumped from the bedroom window because the window was open and there were marks in the snow; that Sheena had told them that Markis was wearing a red tank top, black pants, and no shoes; that when they arrested Markis, he was wearing a red tank top, black pants, and no shoes; and that the arrest had occurred about 30 to 45 minutes later after a short foot chase.

Officer Reynolds additionally testified about the gun he found on the bedroom floor, which he seized as evidence. Officer Reynolds testified that the gun had no ammunition in it, although there was an empty casing inside the gun. Officer Reynolds explained that he found live ammunition in other places around the apartment. The actual gun, photos of the gun, ammunition, and photos of the ammunition were admitted into evidence. Those exhibits, as well as all of the other trial exhibits admitted into evidence, are not included in the record on appeal.

Evidently, Officer Osen remained with Sheena at the apartment until he received a call that the man matching Markis' description was nearby, at which point he also started searching for Markis. Officer Osen testified that while speaking to Sheena before Markis' arrest, Sheena told him that Markis had touched her, pointed a gun at her, pulled the trigger twice, and not allowed her to leave the apartment. Officer Osen testified that Sheena told him that Markis had been yelling that he was not "going to get screwed over." Officer Osen further testified that Sheena told him that she and Markis had been arguing about whether she had flirted with another man at work.

Detective Olmos testified about getting a written statement from Sheena. Sheena made a written statement around 1 p.m. January 6, 2015, regarding the argument. The statement was admitted into evidence. Detective Olmos also testified that he took photos of the texts that Sheena and Markis had sent to one another the afternoon of January 5, 2015. Those photos were also admitted into evidence. Last, Detective Olmos testified that Sheena told him that Markis had pointed his gun at her and pulled the trigger twice.

Sheena testified that she was only testifying because she was afraid she would go to jail if she refused. When the prosecutor asked Sheena questions, Sheena continually testified that she could not recall anything that led to Markis' arrest. As a result, the trial court allowed the State to treat Sheena as an adverse witness. The State then moved to admit Sheena's direct examination from the preliminary hearing into evidence. The trial court granted the State's motion over Markis' objection. Accordingly, from then on, when Sheena could not recall an answer, the State directed Sheena to read her responses from the preliminary hearing. Overall, Sheena was forced to read the portions of her preliminary hearing testimony regarding Markis yelling at her for flirting with another man, Markis pointing the gun at her while pulling the trigger, and Markis scaring her because he was threatening her with the gun. The State also admitted Sheena's 911 call into evidence.

5

Markis' attorney's cross-examination of Sheena emphasized that Sheena had three children, including one with Markis. When asked about her children, Sheena was forced to admit that all three of her children had been removed from her custody. Sheena testified that although she was no longer planning on reuniting with her children, she had been trying to reunite with them when the argument with Markis occurred. Sheena admitted that it was her understanding that she had a better chance at reuniting with them if she separated from Markis. Regarding the actual argument between Sheena and Markis, Sheena testified that their argument never got physical. Yet, Sheena also testified that during their argument, Markis picked up his gun, pointed it at her, and pulled the trigger. Finally, Sheena admitted that she knew she could get in trouble if she made a false police report.

Before the State rested, it admitted a statement of agreed stipulations. The parties' stipulation included that Markis was not supposed to have a firearm because he had been convicted of a felony within the last 5 years.

The only witness who testified on Markis' behalf was his father, Michael Mitchell, Sr. Michael testified that Sheena had called him while she and Markis were arguing. Michael testified that when Sheena called him, she was frantic, angry, and upset. Michael testified that he believed that some of the things that Sheena alleged Markis had done did not actually happen. Michael explained that Sheena and Markis were still married and still in a relationship. Michael also explained that Sheena told him that she was only testifying because the prosecutor had threatened her with jail time if she refused.

After Michael's testimony, Markis rested. During the jury instruction conference, Markis did not object to any of the instructions.

During closing, Markis' attorney admitted that Markis and Sheena had been arguing and that he had run away from the police. Nevertheless, Markis' attorney asserted

6

that Markis had never committed any crimes against Sheena. Markis' attorney argued that Sheena was lying about what had really happened, stating:

"I think there's a subtle yet interesting factor in this case upon which the verdict hinges, and I think that factor has to do with Instruction No. 9. It is for you to determine the weight and credibility to be given to the testimony of each witness. . . .

"And the subtle yet interesting factor upon which I think that you need to focus is when . . . Sheena was testifying. [Sheena] was testifying for the prosecutor and for a lot of her testimony when I was cross-examining her, she was teary-eyed and meek and mild, and . . . couldn't really talk . . . until I became confrontational. Then she could sit up straight and tell me everything that thing happened . . . that she was sure about this.

"What was the difference? Well, I irritated her. I maybe made her a little bit mad, and then suddenly she could remember everything. Then suddenly she was ready to convict [Markis]. So you have to ask yourself what is the truth, [and] what is not, with someone like [Sheena].

. . . .

"[Sheena] [] knew on the night in question, since her kids had been taken from her about six months earlier, that if she stayed with [Markis], she wasn't going to get them back, either. And she knew that in January, and she knew that in February when she came to the preliminary hearing and testified, not in front of a jury, not when it really mattered.

"So in her fit of irritation or anger or immaturity or whatever it was in January of 2015, she called 911. Now she can't take that back, can she? There's been statements; there's been investigations; there's been other court hearings; there's been . . . money put on the books . . . she can't step back from all that because, what happens? Well she told you. She's afraid she might go to jail then. She doesn't want to sacrifice her freedom. She wanted him gone, and she made it happen.

. . . .

"Don't let the fact that she looks a certain way or can act a certain way or can be meek and mild fool you regarding what really occurred on that night in question and here today as well. You don't know this person who testified, that she's telling the truth. And just because someone raises their hand and says, I'm gonna [*sic*] tell the truth, God's not going to strike them dead if they don't.

"Here's a woman with three kids, three fathers, no intent on reunifying with the kids, what does it matter if she throws another life away? She maintains a close family relationship with my client's family. Why? Is it guilt because of what she's done? . . .

"So why are we here? Well, [Sheena] doesn't want to go to jail. She wants to claim now that she's being forced to testify, so again she being victimized, this time by the State. She'd never do that to her husband and lie; she's being forced to. She gets the world she wants; no husband, keep the Mitchell family in her grip, no kids to worry about, and she can move on her way to create whatever new life she may try to create for herself.

. . . .

"So, ladies and gentleman, if anything that I'm not going to contest is the obstruction. [*Sic.*] Did he run around and did the cops chase him around at night with his shoes off? Yeah, that happened. Did he make their job harder? Yeah, he did. But the rest of it did not happen, and I'm going to ask for you to find him not guilty."

Then, in the State's rebuttal, the prosecutor stated:

"I certainly wish that I could come up and explain every single action or statement made by Sheena Mitchell, but what I am going to ask you not to do is re-victimize her and essentially throw her entire person and credibility under the bus because somebody is making statements about whether or not her children are in custody or whether or not they were in her custody back in January or whether or not she's ever going to reunify with them."

In the end, the jury convicted Markis of aggravated assault, criminal in possession of a firearm, interference with a law enforcement officer, and criminal threat. The jury was unable to reach a verdict on criminal restraint; the State then decided to dismiss that count. Last, the jury found Markis not guilty of domestic battery.

The trial court sentenced Markis to a total of 33 months' imprisonment followed by 12 months' postrelease supervision. The trial court ran Markis' sentences for his aggravated assault and interference with a law enforcement officer convictions

8

consecutively. The trial court ran Markis' remaining sentences concurrent to his primary aggravated assault sentence.

*Did the Prosecutor Commit Reverisble Misconduct or Error?*

Markis' primary argument on appeal is that the prosecutor's comment that the jury should not "re-victimize" Sheena or "throw [Sheena's] entire person and credibility under the bus" because of her child custody situation was improper. Markis argues that this comment was intended to inflame the passions and prejudices of the jury. Markis further argues that the comment was not harmless because it was gross, flagrant, and demonstrated ill will. Therefore, Markis contends that he is entitled to reversal of his convictions for aggravated assault, criminal in possession of a firearm, and criminal threat. Markis does not challenge his interference with a law enforcement officer conviction given that he conceded that he was guilty of this offense at trial.

The State responds that the prosecutor's comment was proper because she merely responded to Markis' attorney's statements about Sheena during closing. The State further argues that even if the comment was improper, the effect of the comment was harmless.

*Standard of Review*

On September 9, 2016, our Supreme Court changed the standard for reviewing challenges concerning prosecutorial conduct when it decided *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016). *Sherman* overruled the former standard stated in *State v. Tosh*, 278 Kan. 83, 91 P.3d 1204 (2004). Of note, in overruling the former standard, the *Sherman* court renamed judicial review of prosecutorial behavior from "prosecutorial misconduct" to "prosecutorial error." 305 Kan. 88, Syl. ¶ 5.

9

Since the *Sherman* decision, our Supreme Court has used the old *Tosh* test while analyzing claims of prosecutorial misconduct in *State v. Carter*, 305 Kan. 1379, 380 P.3d 189 (2016), and *State v. Netherland*, 305 Kan. 167, 379 P.3d 1117 (2016). In those cases, our Supreme Court applied the former prosecutorial misconduct standard because "*Sherman* was not decided until [the] case[s] [were] argued and fully submitted for decision." In *State v. Kleypas*, 305 Kan. 224, 382 P.3d 373 (2016), however, our Supreme Court applied both the old *Tosh* test and the new *Sherman* test.

Under *Tosh*, appellate courts review prosecutorial misconduct claims in a two-step process.

"First, an appellate court determines whether there was misconduct, *i.e.*, whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. Second, if misconduct is found, the appellate court determines whether those comments compel reversal, *i.e.*, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. [Citation omitted.]

"In applying the second step and determining whether the defendant was denied a fair trial, an appellate court considers three factors: (1) whether the misconduct was gross and flagrant, (2) whether it was motivated by prosecutorial ill will, and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. No one factor is controlling." *Kleypas*, 305 Kan. at 314 (citing *Tosh*, 278 Kan. at 93).

Moreover, under *Tosh*, the State must establish harmlessness under the tests outlined in both K.S.A. 2015 Supp. 60-261 and *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). 278 Kan. at 96. K.S.A. 2015 Supp. 60-261 states:

"Unless justice requires otherwise, no error in admitting or excluding evidence, or any other error by the court or a party, is ground for granting a new trial, for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order. At every

10

stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."

*Chapman* held that courts should not find an error harmless unless the error is clearly harmless beyond a reasonable doubt. 386 U.S. at 23. The final part of the second step of the *Tosh* test combines K.S.A. 2015 Supp. 60-261 and *Chapman*, requiring courts to consider whether there is no reasonable possibility that the misconduct affected the verdict of the case. If there is no reasonable possibility that the misconduct affected the verdict of the case, then this court must affirm because the misconduct was harmless. *Kleypas*, 305 Kan. at 257. The State has the burden of establishing harmlessness. *State v. Williams*, 299 Kan. 509, 559, 324 P.3d 1078 (2014).

Under the new test outlined in *Sherman*, appellate courts still review claims challenging a prosecutor's conduct under a two-step process. Nevertheless, the *Sherman* court modified the test as follows:

"These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [ ]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.] We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' [Citation omitted.]" *Sherman*, 305 Kan. at 109.

11

Thus, under the new *Sherman* test, the first step of the process remains the same as the old *Tosh* test because appellate courts must consider whether the prosecutor's comment was outside the wide latitude of propriety. Yet, the second step under the new *Sherman* test simplifies the second step under the old *Tosh* test. Instead of considering whether the misconduct was gross and flagrant, was motivated by prosecutorial ill will, or had little weight in minds of jurors given the overwhelming evidence supporting the commission of the crime, appellate courts need only consider the very last prong of *Tosh*'s second step—whether there is no reasonable possibility that the error affected the verdict.

*Preservation*

Markis did not object to the comment in question at trial. Regardless, appellate courts will review whether the prosecutor committed misconduct, now error, during closing arguments even if there was no contemporaneous objection. See *State v. Roeder*, 300 Kan. 901, 932, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015). Accordingly, Markis' challenge is properly before this court.

*The Prosecutor's Comment*

Markis argues that the prosecutor's comment to the jury that it should not "re-victimize" Sheena and throw her "entire person and credibility under the bus" was improper because it was intended to inflame the passions and prejudices of the jury. Markis emphasizes that in making this comment, the prosecutor told the jury that it would "somehow become the offender if it chose not to believe Sheena's testimony." Mark also compares his case to the prosecutorial comments at issue in *Tosh* and in *State v. Martinez*, 290 Kan. 992, 1013, 236 P.3d 481 (2010).

The State concedes that "re-victimize" was probably not the best word choice. Nonetheless, the State contends that the prosecutor's comment was proper given that the prosecutor made this comment in rebuttal to Markis' attorney's closing attacking Sheena's credibility by using her child custody situation. To support this contention, the State cites *State v. Young*, No. 107,378, 2013 WL 6726268 (Kan. App. 2013) (unpublished opinion), *rev. denied* 300 Kan. 1108 (2014). In *Young*, this court cited *State v. Bennington*, 293 Kan. 503, 532, 264 P.3d 440 (2011), for the proposition that appellate courts may consider whether the prosecutor made the comment in question in rebuttal to something stated in the defense's closing. 2013 WL 6726268, at *3.

Yet, recently, our Supreme Court has rejected this proposition. For instance, in *Roeder*, 300 Kan. at 934, our Supreme Court stated that "'a prosecutor's improper comment or argument can be prejudicial, even if the misconduct was extemporaneous and made under the stress of rebutting arguments made by defense counsel. The extemporaneous, rebuttal nature of a prosecutor's argument is merely a factor to be considered by an appellate court.' [Citation omitted.]" In *State v. Sprague*, 303 Kan. 418, 429, 362 P.3d 828 (2015), our Supreme Court explained that even if the prosecutor makes the improper comment in rebuttal, "'[t]he open-the-door rule does not insulate a prosecutor from a finding of misconduct.' [Citation omitted.]" Consequently, although this court can take into account that a prosecutor commented while rebutting the defense, this fact does not preclude a misconduct or error finding.

Here, it is readily apparent that the prosecutor made the comment in response to Markis' attorney's closing. Again, in Markis' closing, the attorney argued that Sheena's testimony was unreliable because she had ulterior motives for calling the police; specifically, she believed that removing Markis from her life would increase her chances of reuniting with her children. Markis' attorney stated that Sheena was "a woman with three kids, three fathers, no intent on reunifying with the kids, [thus] what [did] it matter if she thr[ew] another life away?" Overall, Markis' attorney's closing was very critical of

13

Sheena, sometimes unnecessarily so. For instance, the fact that Sheena's children had different fathers was totally irrelevant to Markis' case. It seems that this statement was made for no other purpose but to attack Sheena's character simply because she had children with different men.

For the sake of argument, we will, for the present purposes only, assume that the prosecutor's comment was outside the wide latitude of propriety under the *Tosh* test and the *Sherman* test. Therefore, this court must proceed to the second step of those tests to determine if the comment was harmless.

*Second-Step* Tosh *Test*

To review, under the second step of the *Tosh* test, this court must consider whether the conduct was gross and flagrant, whether the prosecutor was motivated by ill will, and whether the evidence was so overwhelming that the comment had a minimal effect. 278 Kan. at 93. No single factor controls. *Kleypas*, 305 Kan. at 314. Moreover, to affirm, this court must be able to hold that the comment was harmless, meaning that there was no reasonable possibility that the comment affected the jury's verdict. *Kleypas*, 305 Kan. at 315. The State has the burden of establishing harmlessness. *Williams*, 299 Kan. at 541.

"In determining whether prosecutorial misconduct was gross and flagrant, among the things an appellate court considers are whether the comments were repeated, emphasized improper points, were planned or calculated, violated well-established or unequivocal rules, or violated a rule designed to protect a constitutional right." *State v. Crawford*, 300 Kan. 740, 752, 334 P.3d 311 (2014). Here, the comment was only stated once. The comment did not seem planned or calculated. Instead, the comment seemed like a spur of the moment response to Markis' attorney's harsh criticism of Sheena during closing.

14

In *Tosh*, our Supreme Court held that the prosecutor's comment about the defense raping the victim again was gross and flagrant. 278 Kan. at 94, 98. In *Martinez*, however, our Supreme Court held that the prosecutor's comment about the jury having the power to protect the victim was not gross and flagrant because unlike *Tosh*, the prosecutor's statement did not suggest that the victim would be harmed again. 290 Kan. at 1016. The prosecutor in this case certainly suggested that Sheena would be harmed again if the jury did not believe her testimony. The word choice of the prosecutor in this case—"re-victimize" and throwing Sheena "under the bus"—is not quite as strong as the "rape" word choice in *Tosh*. Nonetheless, the prosecutor in Markis' case stated that *the jury*, as opposed to just defense counsel, would re-victimize the victim again. Thus, in this respect, the prosecutor's comment in Markis' case was far worse than the prosecutor's comment in *Tosh's* case because it burdened the jury with hurting Sheena by not believing her testimony. For this reason, the prosecutor's comments about re-victimizing Sheena and throwing her person and credibility under the bus were gross and flagrant.

In regards to ill will, our Supreme Court generally examines if the prosecutor's conduct seemed planned and deliberate, looking to see if the comment was repeated. *State v. Akins*, 298 Kan. 592, 610, 315 P.3d 868 (2014). This analysis often overlaps with determining whether the comment in question was gross and flagrant. *Akins*, 298 Kan. at 610. As argued by the State in its brief and noted in the preceding paragraphs, the prosecutor's comments were not repeated. Furthermore, it seems that the prosecutor's comments were unplanned. In reviewing the record, it seems that the extent of the defense attorney's criticism of Sheena caught the prosecutor off-guard, which resulted in the prosecutor making the comments.

In his brief, Markis argues that the prosecutor must have had ill will because the comment was made to inflame the passions and prejudices of the jury. Markis, however, recognizes that this court has found comments improper because they were made to inflame the passions and prejudices of the jury while also finding no ill will. Markis still

15

contends, however, that if a comment was made to inflame the passions and prejudices of the jury, then it was also necessarily made with ill will.

Kansas courts have not adopted such an interpretation. Instead, whether a comment was made with ill will focuses less on the content of the comment and more on whether that comment was deliberately made by the prosecutor to violate the court's ruling or the defendant's rights. See *Akins*, 298 Kan. at 610. Ill will has to do with premeditation. As considered, in this case, it seems that the prosecutor's comment was not premeditated. Therefore, the prosecutor's comment was not made with ill will.

Next, this court must look at the weight of the evidence against Markis to determine if the prosecutor's comment affected the verdict. Markis asks that this court reverse his aggravated assault, criminal in possession of a firearm, and criminal threat convictions. Without further explanation, Markis alleges that the evidence against him was not overwhelming.

As the State explains in its brief, however, substantial evidence supported Markis' convictions. At his jury trial, Sheena was a reluctant witness. Nevertheless, through her testimony, the jury heard that Markis pointed a gun at her while pulling the trigger twice. The portion of Sheena's preliminary hearing testimony admitted into evidence included Sheena's testimony that Markis had pointed a gun at her, pulled the trigger two times, and yelled "people were going to die." Sergeant Fairbanks, Officer Reynolds, and Officer Osen all testified about responding to Sheena's 911 call. They all testified that Sheena had alleged that Markis had threatened her with his gun. Officer Reynolds testified about finding the gun on Markis' bedroom floor. Officer Osen testified that during his conversation with Sheena, she was very upset, told him that Markis had pointed a gun at her, had pulled the trigger twice, and had yelled that he was not "going to get screwed over." Moreover, Detective Olmos testified about taking a statement from Sheena, a statement which matched Sheena's trial testimony about her and Markis' argument.

16

Based on the preceding evidence, it is readily apparent that the improper comment had minimal effect on the jury because the evidence supporting Markis' guilt was direct and overwhelming. To summarize, Sheena's testimony and the police officers' testimonies confirming Sheena's testimony supported Markis' aggravated assault conviction and criminal threat conviction. This same evidence, as well as the gun found in Markis' bedroom, supported Markis' criminal possession of a firearm conviction. Last, Markis never presented evidence contradicting Sheena's version of events. Accordingly, the evidence supporting Markis' guilt was so direct and overwhelming that the improper comment had a very minimal effect, if any, on the jury's verdicts.

Under the final part of the second step of the *Tosh* test—the harmlessness test, we determine that there was no reasonable possibility that the alleged misconduct contributed to the verdict. From the three factors discussed, the only factor that weighs in Markis' favor was that the prosecutor's comment was gross and flagrant. Yet, the prosecutor's comment was not made with ill will, and, most importantly, the weight of the evidence supported Markis' convictions. Moreover, we note that the jury was unable to reach a verdict on Markis' criminal restraint count and the jury found him not guilty for his domestic battery count.

Evidence supporting Markis' guilt for criminal restraint and domestic battery existed. For instance, within the preliminary hearing testimony admitted into evidence, Sheena testified that Markis would not let her leave the apartment and that Markis forcibly touched her arm. Officer Osen and Detective Olmos also testified that Sheena had alleged that Markis would not let her leave the apartment. Thus, Sheena's direct testimony and Officer Osen and Detective Olmos' statements about what Sheena had told them supported that Markis criminally restrained and battered Sheena. Yet, the jury decided to discredit those statements either made by or attributed to Sheena. Because the jury discredited those statements, the prosecutor's comment about not re-victimizing Sheena and throwing her credibility under the bus undoubtedly held little to no sway with

17

the jury. For if the jury had been swept away by the comment, it would have found Markis guilty of criminal restraint and domestic battery, also.

To conclude, the State's harmlessness arguments under the second-step of the *Tosh* test are compelling. The lack of ill will and the overwhelming evidence against Markis supports that there was no reasonable possibility that the jury's verdicts were affected by the prosecutor's improper comment. Moreover, the fact that the jury discredited some of Sheena's statements, not paying heed to the prosecutor's statement about re-victimizing Sheena, supports this conclusion. As a result, we determine that under the *Tosh* test, the misconduct was harmless.

*Second-Step* Sherman *Test*

To review, the second-step of the *Sherman* test is the same as the last part of the second-step of the *Tosh* test. Under the second step of the *Sherman* test, the State must establish harmlessness by showing that there was no reasonable possibility the improper comment affected the jury's verdict. See *Kleypas*, 305 Kan. at 323 (explaining the last part of the second step of the *Tosh* test is identical to the second step of the *Sherman* test). Accordingly, the analysis in the preceding paragraphs regarding harmlessness under the *Tosh* test applies equally under the new *Sherman* test. While we assumed that the prosecutor's conduct was error under the new *Sherman* test, we determine that error was harmless because the evidence supporting Markis' guilt was very strong. In turn, there was no reasonable possibility that the prosecutor's comment affected the jury's verdicts. Furthermore, this conclusion is supported by the fact the jury discredited some of Sheena's testimony by not reaching a verdict on Markis' criminal restraint count and reaching a not guilty verdict on Markis' domestic battery count.

18

*Did the Trial Court Err in Instructing the Jury?*

Next, Markis argues that the trial court erred because it instructed the jury against nullification. Specifically, Markis argues that the trial court instructed the jury against nullification when it gave the following instruction: "Your verdict *must* be founded entirely upon the evidence admitted and the law as given in these instructions (Instruction No. 16)." (Emphasis added.) Instruction No. 16 is a direct quote from the Pattern Instructions for Kansas (PIK)—Criminal 4th 68.010 on concluding remarks to the jury. Markis argues that "[a]lthough the jury should not be told that they can nullify, it is a misstatement of law and therefore erroneous to tell the jury that they cannot nullify and must base their decision on the 'evidence admitted and the law as given.'" Markis further argues that but for this error, "there [was] a very real possibility that the jury would have nullified and acquitted [him] based upon a belief that [t]he circumstances [in his case did] not support the convictions." Accordingly, Markis argues that this court must reverse all of his convictions, including his interference with a law enforcement officer conviction, and remand for a new trial.

The State counters that there was no error because "telling the jury to follow the law cannot have any effect on the jury's power to commit jury nullification." In the end, the State is correct. Thus, we affirm.

*Standard of Review*

An appellate court uses the following standard for reviewing jury instruction challenges:

> """(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was

19

legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).'" [Citation omitted.]" *State v. Fisher*, 304 Kan. 242, 256-57, 373 P.3d 781 (2016).

*Preservation*

Under K.S.A. 2015 Supp. 22-3414(3), "[n]o party may assign as error the giving or failure to give an instruction . . . unless that party objects thereto before the jury retires to consider its verdict stating distinctly the matter to which the party objects and the grounds for the objection unless the instruction or failure to give an instruction is clearly erroneous." Consequently, appellate courts may review jury instruction challenges raised for the first time on appeal but will only reverse if the defendant can establish clear error. *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012). Jury instructions are deemed clearly erroneous "only if the reviewing court is firmly convinced that the jury would have reached a different verdict had the error not occurred." *State v. Tully*, 293 Kan. 176, 196, 262 P.3d 314 (2011).

Markis admits that he did not object to Instruction No. 16 at trial. Nonetheless, he argues that he can establish that the instruction was clearly erroneous. Thus, this court must consider (1) if Instruction No. 16 was erroneous, and (2) if so, whether Instruction No. 16 was clearly erroneous. An appellate court exercises unlimited review when determining whether the giving of an instruction was clearly erroneous. *Williams*, 295 Kan. at 515-16.

*Was Instruction No. 16 Legally Appropriate?*

In *Silvers v. State*, 38 Kan. App. 2d 886, 888, 173 P.3d 1167, *rev. denied* 286 Kan. 1180 (2008), this court explained jury nullification as follows:

> "'A jury's knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness.' [Citation omitted.]"

Thus, jury nullification is always a possibility, but as the State points out in its brief, trial courts must not instruct the jury on nullification. In *State v. Naputi*, 293 Kan. 55, 65-66, 260 P.3d 86 (2011), for example, our Supreme Court explained that the trial court must not instruct jurors on the power of nullification because the legislature writes the law, meaning it is not the role of the trial court to tell jurors that they can ignore the law. All the same, in *State v. Smith-Parker*, 301 Kan. 132, Syl. ¶ 6, 340 P.3d 485 (2014), our Supreme Court held that trial courts cannot instruct the jury that it "must" or "will" enter a verdict because this is too similar to directing a verdict for the State. Consequently, trial courts must neither instruct the jury on nullification nor instruct the jury against nullification.

Here, Markis argues that the word "must" in Instruction No. 16 instructed the jury that it could not invoke its power to nullify. Citing *State v. Allen*, 52 Kan. App. 2d 729, 736, 372 P.3d 432 (2016), Markis emphasizes that appellate courts have held that the terms "must" and "should" are not interchangeable.

In *State v. Lovelace*, 227 Kan. 348, 354, 607 P.2d 49 (1980), *overruled in part by Smith-Parker*, 301 Kan. 132, the *Lovelace* court determined that the terms "must" and "should" in a reasonable doubt jury instruction were interchangeable. The *Smith-Parker*

21

court overruled this determination, finding that the word "must" was too close to directing a verdict in favor of the State and against jury nullification when used in a reasonable doubt jury instruction. 301 Kan. 132, Syl. ¶ 6, 164. The *Allen* case that Markis relies on in his brief held that "must" was too close to directing a verdict for the State based upon our Supreme Court's language in *Smith-Parker* that "must" and "should" are not interchangeable.

Yet, the discussion of the term "must" in *Smith-Parker* and *Allen* involved reasonable doubt jury instructions. Instruction No. 16 simply tells the jury that it must consider the evidence presented and the applicable law. Thus, in this case, the particular portion of the jury instruction at issue involves what the jury must consider while deliberating. It says nothing about reasonable doubt. In other words, unlike the instruction at issue in *Smith-Parker*, Instruction No. 16 did not tell the jury that it must find the defendant guilty if there was proof beyond a reasonable doubt. Consequently, the caselaw Markis relies on is distinguishable.

Moreover, unlike language in a reasonable doubt jury instruction that the jury "must" find a defendant guilty if there is proof beyond a reasonable doubt, the "must" direction in Instruction No. 16 applies to both the State and Markis. Instruction No. 16 states that the jury must consider the evidence and law when reaching its verdict. There are no other constraints on the jury's deliberations. Thus, the rule that the jury must consider the evidence and law while making its determination applies when the jury finds the defendant guilty, when the jury finds the defendant not guilty, and *when the jury nullifies the verdict*.

This is because nothing within Instruction No. 16 precludes the jury from nullifying a verdict. That is, Instruction No. 16 never states or implies that the jury could not invoke its power of nullification after deciding to nullify a verdict based on the evidence presented and laws at issue. Indeed, the basis of jury nullification is that "the

law does not authorize a jury to render [the verdict] because the conclusion drawn is not justified by the evidence." See "verdict contrary to law", Black's Law Dictionary 1792 (10th ed. 2014). Consequently, a jury could not nullify a verdict without first considering the evidence presented and law at issue. In turn, the trial court's use of the term "must" in Instruction No. 16 was proper because juries must consider the evidence and law before nullifying a verdict.

Finally, this court has rejected identical arguments regarding the use of the term "must" in the same instructions in two recent cases. See *State v. Moss*, No. 113,034, 2016 WL 3856824, at *16-17 (Kan. App. 2016) (unpublished opinion); and *State v. Boone*, No. 110,836, 2015 WL 3632046, *4-5 (Kan. App. 2015) (unpublished opinion), *rev. denied* 303 Kan. 1079 (2016). The *Moss* court rejected this argument because when looking at all the instructions as a whole, it was clear that the trial court was not instructing against nullification. 2016 WL 3856824, at *16-17. The *Boone* court rejected the identical argument because (1) the instruction applied equally to the State and the defendant and (2) the instruction did not tell the jury that it could not nullify a verdict. 2015 WL 3632046, at *4. Although *Moss* and *Boone* are merely persuasive authority, they are instructive given that they involve the same argument at issue in this case.

In summary, Instruction No. 16 was legally appropriate for the following reasons: (1) the caselaw Markis relies on is distinguishable; (2) the instruction does not instruct against jury nullification; and (3) the identical argument has been previously rejected by this court. Accordingly, the trial court did not err by giving Instruction No. 16. As a result, we affirm the trial court.

Affirmed.